Gary A. Gotto, No. 007401
Ron Kilgard, No. 005902
Keller Rohrback L.L.P.
3101 N. Central Ave., Suite 1400
Phoenix, Arizona 85012
Tel: (602-248-0088)
Fax: (602-248-2822)
ggotto@kellerrohrback.com
rkilgard@kellerrohrback.com

Daniel J. Mogin (*pro hac vice pending*)
Timothy Z. LaComb (*pro hac vice pending*)
MOGINRUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 687-6611
Fax: (619) 687-6610
dmogin@moginrubin.com
tlacomb@moginrubin.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Monica Miller; Travis Miller; Rachel Archibald; Dirk Shupe; Breanna Brinton-Rodriguez; and Osvaldo Rodriguez, on behalf of themselves and a class of persons similarly situated, | **Case No. _____** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| -vs- | |
| DMB Mesa Proving Grounds LLC; DMB Associates, Inc.; DMB/Brookfield Eastmark LLC; Brookfield Eastmark LLC; Brookfield Residential (Arizona) LLC; Brookfield Residential Properties ULC; Christina Christian; Holly Crea; Paul Lillis; Tom Bongiorno; and Eric Tune, | |
| Defendants. | |

1.      Plaintiffs Monica Miller, Travis Miller, Rachel Archibald, Dirk Shupe, Breanna Brinton-Rodriguez, and Osvaldo Rodriguez allege the following against Defendants DMB Mesa Proving Grounds LLC; DMB Associates, Inc.; DMB/Brookfield Eastmark LLC; Brookfield Eastmark LLC; Brookfield Residential (Arizona) LLC; Brookfield Residential Properties ULC (collectively, "Developer Defendants") and Christina Christian, President of the Eastmark Community Alliance (the "ECA"); Holly Crea, Vice President of the ECA; Paul Lillis, Secretary and Treasurer of the ECA; Tom Bongiorno, former Secretary and Treasurer of the ECA; and Eric Tune, former President of the ECA (collectively, "Board Defendants"):

## I.      NATURE OF THE ACTION

2.      Eastmark is a master-planned community in Mesa, Arizona that has been jointly owned and developed by Developer Defendants. Until January 1, 2018, Defendant DMB Mesa Proving Grounds LLC was in charge of the day-to-day operations. Since then, and during most of the misconduct alleged herein, Defendant Brookfield Residential (Arizona) LLC has been responsible for the day-to-day operations. Plaintiffs and members of the Class (defined below) are homeowners in Eastmark.

3.      Developer Defendants repeatedly represented that Eastmark would include a 106-acre contiguous, linear public park running through the center of the community (the "Great Park") and an additional roughly fifty acres of private parkland comprised of private amenities, including a Disc Golf Course and Skate Park, and a buffer zone located primarily near the northeast corner of Eastmark that separated residential and commercial properties.

4.      Regarding the Great Park, Developer Defendants represented they would develop at least ninety acres of the Great Park and reserve an additional sixteen acres in the Great Park for the City of Mesa, which had the right in perpetuity to construct certain high-traffic recreational amenities on this site (the "Recreational Facility Site"). Once the Great Park was completed, Defendants were supposed to convey the land and amenities to the City of Mesa.

5.      In total, the Great Park and private parkland should have combined for roughly 160 acres. The location and nature of these parks were described and depicted by Developer Defendants in recorded documents, marketing materials, site plans, other documents, and oral representations made to Class Members when purchasing their homes.

6.      However, Developer Defendants did not develop Eastmark as promised. Instead, Developer Defendants sold roughly forty acres of Great Park land to residential homebuilders to fill with hundreds of homes. Due to this sale, Developer Defendants could not satisfy their representations to Class Members concerning the Great Park and the private parkland.

7.      Compounding their wrongdoing, Developer Defendants first tried to conceal the fact they could no longer develop Eastmark as promised through misrepresentations to Class Members. In diagrams presented to the Class Members, Developer Defendants claimed the remaining contiguous Great Park land summed to ninety acres even after the sale of Great Park land to developers. It was closer to sixty acres.

8.      Once this misstatement was uncovered, Developer Defendants concocted a scheme to count private parkland, much of it owned by the ECA and comprised of ECA amenities, as Great Park acreage. To effectuate the scheme, Defendants placed a public easement over the Disc Golf Course and the Skate Park and used other private parkland for the Recreational Facility Site. Although the ECA would technically continue to own the land and amenities, the Skate Park and Disc Golf Course would no longer be private amenities for use by ECA members only. Defendants also shifted the operating and maintenance costs for roughly 30% of the Great Park from the City of Mesa to the ECA.

9.      Developer Defendants' scheme contradicts a multitude of oral representations and representations made to Class Members in various documents. These misrepresentations include: the location of the Great Park, the nature of the ECA amenities and private parkland, the combined size of the parks, which entities would own the Great Park land and amenities located thereon, and which entities would be responsible for operating and maintaining the Great Park.

10.     Developer Defendants could not perpetrate their scheme without substantial assistance from the Board Defendants. Because the ECA owned the Skate Park and Disc Golf Course, including the underlying land, only the Board Defendants could grant the public easements. The Board Defendants placed the public easements over these amenities without obtaining any compensation for ECA members. They likewise assumed the obligations to operate and maintain large portions of the Great Park without receiving any compensation for doing so. Making matters worse, the Board Defendants repeatedly failed to timely provide material information to ECA members and/or answer questions concerning the Developer Defendants' scheme. Developer Defendants aided and abetted this misconduct every step of the way.

11.     The Board Defendants were heavily conflicted. Each Board Defendant was appointed by Developer Defendants and all or virtually all serve or served as employees of Defendant Brookfield Residential (Arizona) LLC and/or its affiliates. Due, at least in part, to these conflicts, the Board Defendants consistently acted in favor of Developer Defendants and against the ECA members, despite legal duties requiring the opposite.

12.     Plaintiffs seek damages they have suffered as a direct and proximate result of Defendants' unlawful conduct and injunctive relief to undo Defendants' scheme to the extent possible.

## II.     JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, and at least one Class Member is diverse from at least one defendant.

14.     This Court has personal jurisdiction over Defendants because each is either a resident in this district or transacts substantial business in this district. Each Defendant has conducted systematic and continuous activities in Arizona. Each Defendant has also engaged in purposeful conduct targeted at Arizona and its residents and there is a substantial nexus between that conduct and the claims asserted herein that makes the exercise of jurisdiction over all Defendants reasonable.

15.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c), as Defendants transact business, committed an illegal or tortious act, have an agent, and/or can be found in this district. In addition, the majority of the illegal acts complained of herein occurred in this district.

### III.    PARTIES

16.    Plaintiffs Travis Miller and Monica Miller agreed to purchase their home in Eastmark on March 21, 2019, closed the transaction on November 8, 2019, and have owned this home and been a member of the ECA ever since.

17.    Plaintiffs Rachel Archibald and Dirk Shupe agreed to purchase their home in Eastmark on November 20, 2019, closed the transaction August 13, 2020, and have owned this home and been a member of the ECA ever since.

18.    Plaintiffs Breanna Brinton-Rodriguez and Osvaldo Rodriguez agreed to purchase their home in Eastmark on August 26, 2020, closed the transaction on May 11, 2021, and have owned this home and been a member of the ECA ever since.

19.    Defendant DMB Mesa Proving Grounds LLC is a Delaware limited liability company and master developer of Eastmark. It is headquartered at 6263 N. Scottsdale Road, Suite 330, Scottsdale, AZ 85250. It jointly owns Eastmark with Defendant Brookfield Residential (Arizona) LLC. It was in charge of the day-to-day operation of Eastmark until January 1, 2018. It is an affiliate of Defendant DMB Associates, Inc. (discussed immediately below).

20.    Defendant DMB Associates, Inc. is an Arizona corporation headquartered at 6263 N. Scottsdale Road, Suite 330, Scottsdale, AZ 85250. It is the project manager of Defendant DMB Mesa Proving Grounds LLC, signatory of the First, Second and Third Amendments to the Pre-Annexation and Development Agreement, dated November 3, 2008, and lists Eastmark in its portfolio of projects on its website.

21.    Defendant Brookfield Residential (Arizona) LLC is a Delaware limited liability company and developer of Eastmark. It jointly owns Eastmark with Defendant DMB Mesa Proving Grounds LLC. It has corporate offices at 14646 North Kierland Boulevard, Suite 165,

Scottsdale, AZ 85254. It has been in charge of the day-to-day operation of Eastmark since January 1, 2018. It is a subsidiary of Defendant Brookfield Residential Properties ULC (discussed immediately below).

22.    Defendant Brookfield Residential Properties ULC is a Canadian corporation headquartered at 4906 Richard Road S.W., Calgary, Alberta, Canada T3E 6L1. It is the flagship North American residential property company of Brookfield Corporation (NYSE:BN) and has continuous and systematic contacts in this district, listing Phoenix, Arizona on its website and in numerous financial disclosures as a hub and area it targets for its North American operations. It also prominently features Eastmark on its website and claims to have developed Eastmark in conjunction with Defendant DMB Mesa Proving Grounds LLC. It is an affiliate of Defendant Brookfield Residential (Arizona) LLC.

23.    Defendant DMB/Brookfield Eastmark LLC is a Delaware limited liability company. It has registered to do business in Arizona and has a registered agent at 8825 N. 23rd Ave., Suite 100, Phoenix, Arizona 85021. It is the manager of Defendant DMB Mesa Proving Grounds LLC and signatory to the Fourth and Fifth Amendments to the Pre-Annexation and Development Agreement, dated November 3, 2008.

24.    Defendant Brookfield Eastmark LLC is a Delaware limited liability company. It has registered to do business in Arizona and has a registered agent at 8825 N. 23rd Ave., Suite 100, Phoenix, Arizona 85021. It is an administrative member of Defendant DMB/Brookfield Eastmark LLC and signatory to the Fourth and Fifth Amendments to the Pre-Annexation and Development Agreement, dated November 3, 2008.

25.    The Board Defendants are the following Arizona residents:

    a.  Christina Christian, President of the ECA;

    b.  Holly Crea, Vice President of the ECA;

    c.  Paul Lillis, Secretary and Treasurer of the ECA;

    d.  Tom Bongiorno, former Secretary and Treasurer of the ECA from March 3, 2021 to April 15, 2022; and

e.  Eric Tune, former President of the ECA during all relevant times until May 31, 2022.

26.    Each Board Defendant was appointed by Developer Defendants, which have had the sole power to appoint board members to the ECA. All or virtually all Board Defendants were employees of Defendant Brookfield Residential (Arizona) LLC and/or its affiliates.

27.    The acts alleged to have been done by Developer Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Developer Defendants' affairs.

28.    Developer Defendants, through their subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the agent or joint-venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

## IV.    <u>CLASS ALLEGATIONS</u>

29.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(3) as representatives of a Class defined as follows:

> All persons or entities that purchased a property for residential use in Eastmark prior to January 31, 2022 (the "Class Period") and continue to hold that property, other than persons or entities that purchased a property on land designated for the Great Park by the Great Park Master Plan. Excluded from the Class are Defendants, their subsidiaries, affiliates, and employees.

30.    With respect to all Claims, Plaintiffs meet the requirements for certification under Rule 23(a), as explained in the following paragraphs.

31.    **Numerosity**: Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Hundreds or thousands of people or entities purchased homes in Eastmark during the Class Period.

32.    **Commonality.** There are questions of law and fact common to all Class Members, including:

a.  whether Developer Defendants misrepresented material facts to Class Members concerning the Great Park and/or ECA land and amenities;

b.  whether Board Defendants owed duties to Class Members;

c.  whether the Board Defendants breached their duties to Class Members by granting public easements over the Disc Golf Course and/or the Skate Park for no consideration;

d.  whether the Board Defendants breached their duties to Class Members by agreeing to operate and maintain a substantial portion of the Great Park for no consideration;

e.  whether Developer Defendants aided and abetted the Board Defendants' breaches of these duties;

f.  whether Developer Defendants were unjustly enriched when selling Great Park land;

g.  whether Developer Defendants were unjustly enriched when receiving funds from communities facilities districts to cover the cost of developing ECA land; and

h.  whether Defendants' actions harmed Class Members.

33.     **Typicality**: Plaintiffs' claims and interests are typical of those of absent Class Members.

34.     **Adequacy**: Plaintiffs will fairly and adequately represent the interests of Class Members. The interests of Plaintiffs are aligned with the interests of Class Members. Plaintiffs have also selected counsel with substantial experience litigating and leading complex class actions.

35.     With respect to all Claims, Plaintiffs also meet the requirements for certification under Rule 23(b)(3), as explained in the following paragraphs.

36.     **Predominance.** Questions of law and fact common to all Class Members predominate over questions that may affect individual Class Members, including:

a.  whether Developer Defendants misrepresented material facts to Class Members concerning the Great Park and/or ECA land and amenities;

b.  whether Board Defendants owed duties to Class Members;

c.  whether the Board Defendants breached their duties to Class Members by granting public easements over the Disc Golf Course and/or the Skate Park for no consideration;

d.  whether the Board Defendants breached their duties to Class Members by agreeing to operate and maintain a substantial portion of the Great Park for no consideration;

e.  whether Developer Defendants aided and abetted the Board Defendants' breaches of these duties;

f.  whether Developer Defendants were unjustly enriched when developing hundreds of homes on Great Park land;

g.  whether Developer Defendants were unjustly enriched when receiving funds from communities facilities districts to cover the cost of developing ECA land; and

h.  whether Defendants' actions harmed Class Members.

37.  **Superiority**: A class action is the superior method for the fair and efficient adjudication of this controversy. Class action treatment will permit numerous similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that would pervade individual treatment. Class treatment will also permit the adjudication of many claims by Class Members who could not afford to litigate their claims individually. The prosecution of separate actions by individual Class Members would also create a risk of inconsistent adjudications. Plaintiffs are not aware of any difficulty that would be associated with maintaining this case as a class action under Federal Rule of Civil Procedure 23.

38.  With respect to Plaintiffs' Claims III and IV, Breach of Duty and Aiding and Abetting Breach of Duty, Plaintiffs also meet the requirements for certification under Rule 23(b)(1). Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, and adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

39.  With respect to Plaintiffs' request  that Defendants be enjoined from converting any additional private parkland or amenities to public amenities or Great Park acreage, and

from obtaining any additional CFD Funds (defined below) for costs associated with developing land that is not owned, operated and maintained by the City of Mesa, Plaintiffs also meet the requirements for certification under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class so that injunctive relief is appropriate respecting the Class as a whole.

## V.    FACTUAL BACKGROUND

### A. Development of Eastmark and the Great Park

40.    Developer Defendants owned roughly 3,154 acres in Maricopa County. The City of Mesa agreed to annex this land into the City of Mesa and permit Developer Defendants to develop Eastmark. In exchange, Developer Defendants were required to develop Eastmark consistent with (i) the Pre-Annexation and Development Agreement, dated November 3, 2008 (the "PADA"); (ii) the Community Plan, also dated November 3, 2008 (the "Community Plan"); and (iii) the 2012 Great Park Master Plan.

41.    Most land in Eastmark is within one of two community facilities districts ("CFDs"). The CFD designation enables Developer Defendants to apply for financing for construction of public improvements in the CFD, which must be adopted and accepted for ownership, operation, and maintenance by the City of Mesa. Class Members provide funds through a $3,500 upfront fee paid when purchasing homes and special tax and other assessments ("CFD Funds"). To access the CFD Funds, Developer Defendants must obtain approval from Mesa City Council under A.R.S. § 48-728.

42.    The signature feature of Eastmark was to be the 106-acre Great Park. Developer Defendants and the City of Mesa identified the site and nature of the Great Park in the PADA, Community Plan, and Great Park Master Plan. Each of these documents describes or shows a 106-acre linear, contiguous site running through the center of Eastmark.

43.    The location of the Great Park was also depicted in several other documents that were created by or dispersed by Developer Defendants. These included marketing materials provided to prospective buyers, renditions of Eastmark placed prominently in heavy-traffic

locations like the Eastmark Community Center, and documents made available online. Developer Defendants also made oral representations that the Great Park would be a 106-acre linear, contiguous park running through the center of Eastmark.

44.     Developer Defendants represented they would develop at least 90 acres for the Great Park and reserve an additional 16 acres within the Great Park in perpetuity for the City of Mesa, which had the right to purchase and build the Recreational Facility Site on this parcel. The Recreational Facility Site will include high-traffic amenities and related infrastructure like additional roads and parking lots.

45.     Upon completion of construction of each phase of the Great Park, Developer Defendants are required to convey to the City of Mesa the portion of the Great Park that was developed. Once conveyed, the City is supposed to be responsible for the land's ownership, operation and maintenance.

46.     The diagram on the following page (Figure 1) is the Great Park Master Plan, which depicts a linear, contiguous park running through the middle of Eastmark:

*Figure 1: Great Park Master Plan*



PARK MASTER PLAN- RECREATIONAL USE AREAS
EASTMARK 'GREAT PARK'         04.03.12

47.    Every depiction of the Great Park made between 2012 and 2021 included a linear, contiguous park running through the middle of Eastmark. None indicated the Great Park would be comprised of separate, geographically dispersed pieces of land, as is now the case. Nor did they indicate ECA land or amenities would be counted as Great Park land or that many of the areas earmarked for civic spaces and schools in the Great Park Master Plan would be converted to residential or commercial developments.

**B. ECA Land and Amenities**

48.    Unlike the Great Park, ECA land and amenities were supposed to be private and for use by ECA members only. Eastmark homeowners are ECA members. Developer Defendants are responsible for the costs of developing ECA land and amenities, while ECA members pay for their operation and maintenance through HOA fees. Under Arizona law, Developer Defendants cannot obtain CFD Funds to cover the costs of developing ECA land because the land and improvements are privately owned and maintained and CFD Funds are for public improvements only.

49.    In multiple written and oral representations made to Class Members (including Figure 3 below), Developer Defendants represented they would develop roughly fifty acres of private parkland along the northeast corner of Eastmark, as well as certain land located elsewhere in Eastmark. Much of this parkland, including the Disc Golf Course, was supposed to serve as a buffer zone for residents between residential and commercial land. Roughly half of this land is owned by the ECA, including the almost twenty-two acres on which the Disc Golf Course is located. Developer Defendants also developed the Skate Park on roughly four acres of ECA land.

50.    Defendants repeatedly represented to Class Members in marketing materials, minor site plans and accompanying narratives approved by the City of Mesa, other documents, and orally that the ECA land and amenities were private and separate from the Great Park. For example, Developer Defendants made the following statement in a project narrative for the minor site plan for the Disc Golf Course on March 27, 2018, which was subsequently approved by the City of Mesa:

In accordance with the CP [Community Plan], this application is a request to approve a minor site plan for the Linear Park/Disc Golf Course ("Linear Park") on an approximately thirty-five (35) acre site. The Linear Park **will be for residents of Eastmark and while it is not part of the Eastmark Great Park**, it will eventually be connected to it, providing a seamless outdoor experience for the community at large.

51.    Developer Defendants made similar statements in a project narrative for the minor site plan for the Skate Park on February 18, 2020, which was approved by the City of Mesa.

52.    Attorneys for Developer Defendants confirmed in correspondence in August of 2022 that it was "accurate" that the minor site plans and narrative reports for the Disc Golf Course and Skate Park represented that those amenities were private.

53.    Likewise, in a diagram presented to homeowners in 2020, Developer Defendants presented the private parkland as separate and distinct from the Great Park (*see* Figure 3 below).

54.    Developer Defendants made the same representations to subdevelopers. In Subdeveloper Public Reports ("SPRs") filed with the Arizona Department of Real Estate up to late 2021, the Disc Golf Course is described as a major private amenity. It was not until November 2021 that the first subdeveloper report described either the Disc Golf Course or the Skate Park as a public amenity.

**C. Defendants Misrepresent the Size of the Great Park and Turn ECA Land into Great Park Land**

55.    While Defendant DMB Mesa Proving Grounds LLC ran the day-to-day operations, the first phases of the Great Park were developed as promised. However, after Defendant Brookfield Residential (Arizona) LLC took control on January 1, 2018, the Developer Defendants significantly deviated from their representations. Specifically, Developer Defendants sold roughly forty acres of Great Park land to developers, who are turning this land into hundreds of homesites. Due to these sales, Developer Defendants were unjustly enriched by tens of millions of dollars.

56.     This sale came at a time when Brookfield's stock price was plummeting. Not only did it lose more than 50% of its value between February and March 2020, but it was also dealing with a significant drop in in net income (125% drop from 2019 to 2020) and much higher levels of debt. As a result, even apart from pandemic-related losses, Brookfield was underachieving compared to its peers and there was likely substantial pressure on all Brookfield subsidiaries (including those named as Defendants herein) to maximize profits.

57.     The following diagram (Figure 2) shows approximately the Great Park land converted to homesites (outlined in yellow) and areas earmarked for civic spaces and schools converted to homesites (outlined in red):

*Figure 2*: *Great Park Land Converted to Homesites*



58.     Because Developer Defendants converted dozens of acres of Great Park land to homesites, they could no longer satisfy their commitments to residents concerning the location and size of the Great Park. Compounding this problem, Developer Defendants initially lied to Class Members and tried to convince them that there was still enough room to build the linear, contiguous Great Park on the original site. In written and oral communications to Class Members in 2020, Developer Defendants falsely claimed the remaining Great Park land amounted to roughly ninety acres, even after accounting for the new homesites.

59.     For example, Developer Defendants provided homeowners with the following diagram (Figure 3), in which the "Park Legend" in the upper right-hand corner indicates the various components of the Great Part add up to "90.00 AC." These ninety acres are separate and distinct from the 41.58 acres comprising the "Buffer Zone/Disc Golf."

*Figure 3: 2020 Great Park Depiction*[1]



60.    This statement was false. The Great Park land depicted in the diagram was closer to sixty acres. As sophisticated developers and/or their employees, Developer Defendants knew or should have known this arithmetical tally of the size of the remaining Great Park land was false.

61.    Further highlighting their intent to deceive, Developer Defendants did not amend the PADA, as required, when converting the Great Park land to homesites. Developer

Defendants understood this requirement, as they had executed amendments to the PADA on four other occasions. Developer Defendants ignored the amendment requirement in this instance, thereby keeping Class Members in the dark regarding their actions.

62.     Residents eventually uncovered Developer Defendants' misrepresentation. Unable to continue their ruse and still needing additional land to satisfy their 106-acre commitment for the Great Park, Developer Defendants concocted a scheme to work with the Board Defendants to usurp private parkland and amenities, none of which is linear or contiguous with the existing Great Park and much of which is owned by the ECA, and count it as Great Park acreage. In total, Developer Defendants are now counting more than fifty acres of private parkland as Great Park land, including the Disc Golf Course and Skate Park.

63.     Defendants did not publicly disclose their scheme to convert ECA land to Great Park land until early 2022. By this time, nearly all homes in Eastmark had been sold based on Defendants' misrepresentations concerning the Great Park and the ECA land and amenities.

64.     As required by the City of Mesa, Developer Defendants held a meeting to discuss the conversion of private park land and amenities to Great Park land on May 24, 2022. At this meeting, Class Members raised issues concerning the legality of the scheme and previous misstatements by Defendants. Rather than address these issues, Developer Defendants terminated the meeting early. Defendant Tune also acted aggressively toward certain Class Members at this meeting, leading to an investigation by the Brookfield entities and his removal as ECA President.

65.     On August 16, 2022, attorneys for Developer Defendants circulated a FAQ (Frequently Asked Questions) concerning their scheme. The FAQ explains that Developer Defendants will be formally establishing that the more than twenty-five acres underlying the Disc Golf Course and Skate Park will count toward the Great Park and that the 16-acre site for the Recreational Facilities Site will be taken from private parkland. Developer Defendants also confirmed they would be seeking reimbursement from CFD Funds for development of the Skate Park and the Disc Golf Course even though they were built as private amenities on

private land and continue to be owned and maintained by the ECA, i.e., are not eligible for CFD funding. As detailed below, the FAQ also contained numerous false statements.

66.    Board Defendants did not hold a public meeting following disclosure of the scheme until August 24, 2022. At that meeting, Board Defendants refused to answer questions that were directly or tangentially related to the scheme. Instead, they directed questions on these matters to attorneys for Developer Defendants. Board Defendants did not hold another public meeting until March 1, 2023 – after the scheme had been effectuated.

67.    On December 7, 2022, attorneys for Developer Defendants released an updated FAQ. This document not only repeated the false statements from the original, but also announced Defendants' intention to convert even more private parkland to Great Park land. In the updated FAQ, Defendants explained they are designating "an additional area (approximately 8.76 acres) adjacent to the 16-acre site for Great Park" and that this site is located "terminus of the Disc Golf."

68.    The following diagram was included in the updated FAQ and shows the final site of the now disjointed, non-linear Great Park.

*Figure 3: Updated Map of Great Park*[1]



69.     On December 8, 2022, Defendants converted the Disc Golf Course and Skate Park to Great Park land by placing a public easement over it, and converted an additional twenty-five acres of private parkland to Great Park land. They, thereby, transformed nearly fifty acres of private land and amenities for use by ECA members only to public land and amenities. The Recreational Facility Site will now be built on this land, which will bring high-traffic public amenities and related infrastructure (e.g., roads) to an area that was supposed to be quiet private parkland. Board Defendants did not secure any compensation for ECA members in exchange for giving up their land and amenities.

---

[1] Diagram 4 includes the following acreage for the Great Park: Phase 1 is 7.75 AC; Phase 2 is 4.31 AC; Phase 3 is 27.72 AC; Phase 4 is 24.40 AC; the Skate Park is 3.88 AC; the Disc Golf Course is 21.65 AC; the "Additional Park" added as part of the updated FAQ is 8.76 AC.

70.     The Board Defendants also assumed obligations to operate and maintain nearly 30% of the Great Park, including the Skate Park, the Disc Golf Course, and the multi-use paths connecting the original Great Park to the Disc Golf Course. Prior to this assumption, the City of Mesa was required to operate and maintain the Great Park. Again, Board Defendants assumed these additional liabilities without receiving any compensation for ECA members in exchange.

71.     The Board Defendants also worked to ensure Developer Defendants would receive CFD Funds for the value of the Skate Park Easement and the Disc Golf Easement even though the ECA granted the easements, the ECA members are harmed by the loss of private amenities, and the ECA Members are required to pay to maintain and operate this portion of the Great Park. Specifically, Board Defendants concede they would not have conveyed the easements over the private amenities without the understanding that the value of the easements could be submitted for potential CFD financing by Developer Defendants.

72.     The Board Defendants had the power to grant the Disc Golf Course and Skate Park easements, meaning Developer Defendants' scheme could not take place without approval and actions by the Board Defendants. Specifically, the ECA, through Board Defendants, was the grantor of the Skate Park Easement and the Disc Golf Course Easement and represented to the City and each of the Eastmark CFDs that the ECA had the authority to grant the Skate Park Easement and the Disc Golf Course Easement.

73.     The following timeline provides a lineage of most relevant dates:

| Date | Event |
| --- | --- |
| 11/03/08 | Developer Defendants commit to build the Great Park according to Great Park Master Plan. |
| 04/12/12 | Developer Defendants generate the Great Park Master Plan, which shows a linear, contiguous park running through the middle of Eastmark; *all diagrams of Eastmark to 2021 depict a linear, contiguous Great Park.* |
| 06/01/13 | Eastmark Opens. |
| 01/01/18 | Brookfield Residential (Arizona) LLC takes control of day-to-day operations of Eastmark; development of Great Park largely done according to representations up to this point. |
| 04/27/18 | First Amendment to the Community Maintenance Agreement that reiterates that City of Mesa is responsible for cost of maintaining and owning the Great Park. |

| Date | Event |
|------|-------|
| 11/18/18 | Minor Site Plan and Project Narrative is filed and says Disc Golf Course is private. |
| 02/18/20 | Minor Site Plan and Project Narrative for Skate Park site plan is filed and says Skate Park is private. |
| During 2020 | Developer Defendants sell roughly 40 acres of Great Park land and falsely claim the linear Great Park will be 90 acres. |
| 01/31/22 | Defendants first publicly disclose scheme to convert private parkland and amenities to Great Park land. |
| 05/24/22 | Developer Defendants hold meeting to discuss scheme but cut it short when facing questions concerning its legality. |
| 08/16/22 | Defendants release FAQ explaining that the Disc Golf Course & Skate Park will count toward the Great Park & Defendants will seek reimbursement from CFD Funds for Disc Golf Course/Skate Park. |
| 08/24/22 | Board Defendants hold only public meeting between announcement and effectuation of the scheme but refuse to answer questions concerning the scheme and require all such questions be directed to attorneys for Developer Defendants; Developer Defendants confirm they said Disc Golf Course and Skate Park would be private in site plans. |
| 12/07/22 | Defendants release updated FAQ repeating false statements from original, announce intention to convert additional private parkland to Great Park land, and confirm the ECA would continue to own the Disc Golf Course and Skate Park and underlying land following grant of public easement. |
| 12/08/22 | Defendants place public easement over Disc Golf Course and Skate Park, convert roughly fifty acres of private parkland to Great Park acreage, require the ECA to operate and maintain roughly 30% of the Great Park, and enable Developer Defendants to receive CFD Funds for cost of developing private amenities without providing any competition to homeowners. |

**D. Defendants Make Multiple Misrepresentations to Effectuate Their Scheme**

74.    Defendants' scheme runs afoul of numerous representations made to Class Members. *First*, the Great Park no longer reflects representations made by Developer Defendants in marketing materials, the original PADA, the Community Plan, the Great Park Master Plan, and oral representations. Rather than a 106-acre linear, contiguous park running through the middle of Eastmark, the "new" Great Park is comprised of several distinct pieces of land separated by large residential developments. The following diagram shows the "new" Great Park outlined in red (other than pathways) and demonstrates where it now exists within Eastmark:

*Figure 4: Diagram of New Great Park*



75.    **Second,** the private parkland and amenities no longer reflect representations made by Defendants to Class Members in marketing materials, the 2018 site plan narrative and minor site plan for the Disc Golf Course, the 2020 site plan narrative and minor site plan for the Skate Park, the 2020 diagrams provided by Developer Defendants to Class Members, and several other documents and oral representations. Rather than private parkland consisting of significant amenities for use by ECA members only, Defendants are converting roughly fifty acres to Great Park land. In addition, because Defendants are now using private parkland for the Recreational Facility Site, this land will now include high-traffic public facilities and related infrastructure (e.g., roads) to accommodate the increased crowds. This is despite the fact several Class Members paid lot premiums, in part, to border the private parkland.

76.    **Third,** Defendants repeatedly represented that the 106-acre Great Park would be in addition to the roughly fifty acres of private parkland prior to 2022. These include numerous documents presented to Class Members before and after purchasing their homes and renditions of Eastmark placed in high-traffic locations like the Eastmark Community Center. Based on Defendants' representations, Class Members should be able to use and enjoy more than 160 acres of parkland between the Great Park, the buffer zone/Disc Golf Course, and other ECA amenities, roughly fifty of which should be private with amenities for ECA members only. However, due to Defendants' scheme, Class Members received significantly less.

77.    **Fourth,** the land on which the Skate Park and Disc Golf Course are located will not be conveyed to the City of Mesa and neither the City of Mesa nor Developer Defendants will cover the costs to operate, maintain, and insure this land. Rather, the ECA will technically own the ECA land and amenities subject to the public easement and will be responsible for these costs. This is significant because the cost to operate, maintain, and insure the converted ECA land will increase substantially now that it is open to the public given the inevitable surge in use and corresponding increase in instances of disrepair, injury, and/or vandalism.

78.    **Fifth,** in response to the question "Will there be increased liability to the [ECA] for the Skate Park?", Defendants state in the FAQ and amended FAQ: "No. The Alliance is required to carry liability insurance for all facilities that it manages and maintains." In reality,

the Skate Park will almost certainly notice an increase in liability once it is opened to innumerable additional potential users. The fact some of this liability might be covered by insurance does not change this fact. Moreover, the ECA will almost certainly have to pay significantly more in perpetuity for insurance coverage given the increased number of users and liability.

79.    **Sixth,** in response to the question "Will this change [from private amenity to public amenity] result in more people using the Disc Golf Course and the Skate Park facilities?", the FAQ and amended FAQ says "No." But, by converting these amenities from ECA-member-only to public, innumerable additional people can use these amenities. It is almost certain this change will result in more people using the Disc Golf Course and the Skate Park.

80.    Developer Defendants are also attempting to unjustly enrich themselves by seeking millions of dollars from CFD Funds to cover the costs of developing the Skate Park, Disc Golf Course, and other private parkland. This is not permissible under Arizona law as it pertains to the Disc Golf Course, the Skate Park, and any other land not conveyed to or maintained and operated by the City of Mesa because CFD Funds can only be used to fund construction of public infrastructure. While the public will be able to access these amenities due to the public easements, the ECA will still own the land and improvements, meaning they are not public infrastructure and CFD Funds should not be used to cover the costs of constructing them. Moreover, Developer Defendants repeatedly represented that they would develop the Skate Park, Disc Golf Course, and private parkland at issue for the benefit of ECA members, meaning they could not seek CFD funding if developed as promised. Developer Defendants should not receive a windfall of millions of dollars in CFD Funds provided by ECA members for going back on their promises and converting private parkland and amenities to Great Park land. This is particularly true given that Developer Defendants engaged in this scheme because they sold the land on which portions of the Great Park were supposed to be built.

**E.  The ECA Board Is Conflicted and Breached Its Duties to Class Members**

81.    The ECA Board has the authority to take all actions and perform all obligations on behalf of the ECA, which includes the right to restrict public access as reasonably necessary to prevent public dedication and to prevent or prohibit the use of ECA land. It also owes Plaintiffs and Class Members duties under Arizona law, including the duties (i) to act in good faith, (ii) to act in the best interests of the ECA and its members, (iii) to act with reasonable care, and (iv) to act fairly in relation to ECA members. These duties create a special relationship of trust and confidence between ECA directors and Class Members.

82.    The entire ECA Board is, and at all relevant times has been, beholden to and/or an agent of Developer Defendants. To date, Developer Defendants have had the sole power to appoint members of the ECA Board. In addition, all or virtually all members of the ECA Board were employed by Defendant Brookfield Residential (Arizona) LLC and/or its affiliates while serving on the ECA Board. In fact, Developer Defendants, Board Defendants, and their agents have admitted on several occasions that the ECA Board acts as instructed by the Developer Defendants and will not act contrary to Developer Defendants' objectives even if they conflict with the interests of ECA members.

83.    Due, at least in part, to these conflicts, the Board Defendants have participated in and facilitated Developer Defendants' scheme. For example, the ECA Board granted the public easement over the Skate Park and Disc Golf Course and required the ECA to operate and maintain roughly 30% of the Great Park moving forward without securing any consideration in return. Board Defendants have also repeatedly failed to provide Class Members with material information concerning Developer Defendants' scheme in a timely manner. Board Defendants did not publicly disclose the ECA land and amenities would be transformed into Great Park land until 2022. And they did not hold a single public meeting at which ECA members could ask questions concerning the scheme between the time it was disclosed and when it was effectuated in December 2022. During this time, Board Defendants directed questions concerning the scheme to attorneys for Developer Defendants.

**F. Injury to Class Members**

84.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and Class Members have been and continue to be injured in several ways. Specifically, Plaintiffs and Class Members: (i) will not receive the promised 106-acre linear, contiguous Great Park running through the center of Eastmark because the park is now a disjointed set of parks separated by large residential real estate developments; (ii) have lost exclusive access to roughly fifty acres of private parkland and significant private amenities, including the Disc Golf Course and Skate Park; (iii) will be forced to pay increasing costs for operating, maintaining, and insuring ECA land in perpetuity, which includes paying to operate, maintain and insure roughly 30% of the Great Park; (iv) have suffered a reduction in property value stemming from these actions; (v) have lost millions of dollars of CFD Funds that have been unlawfully paid to Developer Defendants to cover the costs of developing the Skate Park and Disc Golf Course; (vi) have been overcharged HOA fees, as these are intended to cover the cost of operating and maintaining private land but are will now be used to operate and maintain the more costly public land; and (vii) were overcharged for lot premiums that were paid by hundreds of Class Members to border private parkland, as these lots now border Great Park land, and (viii) have suffered an overall degradation in quality of life as Eastmark residents.

**CLAIM I**
**Unjust Enrichment**
**Against Developer Defendants**

85.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

86.    By selling roughly forty acres of Great Park land, Developer Defendants have been unjustly enriched. Developer Defendants repeatedly represented to Plaintiffs and Class Members that the Great Park would be a linear, contiguous park running through the center of Eastmark. They also represented to Class Members that they would build private amenities, including a Disc Golf Course and Skate Park for use by ECA members only and a buffer zone of private parkland running along the northeast corner of the development. Rather than satisfy these representations, Developer Defendants sold roughly forty acres of Great Park land for

millions of dollars. Due to this sale, Developer Defendants could not satisfy their obligations to Class Members concerning the Great Park and private parkland and amenities. This led to their scheme to convert the private parkland and amenities to land open to the general public and count it as Great Park. Developer Defendants perpetrated this scheme without providing any compensation to Class Members. It would be unjust and inequitable to permit Developer Defendants to keep the proceeds from the sale of the Great Park land.

87.     By these same actions, Plaintiffs and Class Members have been impoverished. Rather than receive more than 160 acres of parkland as promised, which included the Great Park and private parkland and amenities discussed in the preceding paragraph, Class Members received significantly less parkland, a disjointed Great Park, and increased liabilities, as they are now required to fund the operation and maintenance of roughly thirty acres of Great Park land. Defendants' actions also caused Class Members to suffer a reduction in property value and an overall degradation in quality of life as Eastmark residents.

88.     There is a direct and significant connection between Developer Defendants' enrichment and Plaintiffs' and Class Members' impoverishment. The same action that led to Developer Defendants' enrichment – selling Great Park land – caused Class Members' impoverishment. Developer Defendants would not have effectuated their scheme and usurped the private parkland and amenities but-for the sale of Great Park land.

89.     There is no justification for Developer Defendants' enrichment. Developer Defendants simply placed profits above representations made to Class Members. If Developer Defendants constructed Eastmark as promised, then their unjust enrichment would not have occurred.

90.     Plaintiffs and Class Members have no adequate remedy at law.

**CLAIM II**
**Unjust Enrichment**
**Against Developer Defendants**

91.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

92.     By receiving CFD Funds, which were funded by Class Members, for development of the Skate Park and the Disc Golf Course, Developer Defendants have been unjustly enriched. Developer Defendants represented they would develop the Skate Park and Disc Golf Course as private amenities for use by ECA members only. This was in addition to the 106-acre contiguous, linear Great Park that was supposed to run through the middle of Eastmark. Therefore, if Developer Defendants built the Skate Park and Disc Golf Couse as promised, then they could not receive CFD Funds for the cost of constructing these amenities because they would unquestionably not constitute public infrastructure.

93.     However, once Developer Defendants sold the roughly forty acres of Great Park land to developers, they concocted a scheme to count the Skate Park and Disc Golf Course as Great Park acreage by placing public easements over the amenities. They then obtained CFD Funds for the cost of constructing these amenities even though the ECA still owns, operates, and maintains these amenities and the underlying land. This process conflicts with statements from Developer Defendants that CFD Funds were available for the cost of constructing these amenities because the amenities would be conveyed to the CFD. Not only is this claim legally incorrect, but the amenities were ultimately not conveyed to the CFD. This process also conflicts with multiple statutes, including A.R.S. § 48-728, which requires the City Council to "accept the discrete segment of public infrastructure for ownership, operation and maintenance" for CFD Funds to be used. It is also unjust and inequitable for Developer Defendants to receive a windfall of CFD Funds for converting the Skate Park and Disc Golf course from private amenities to amenities open to the public. Doing so would effectively reward Developer Defendants for contravening representations made to Class Members in order to maximize their own profits.

94.     By these same actions, Plaintiffs and Class Members have been impoverished. By selling the Great Park land and placing the public easements over the ECA land to receive CFD Funds, Class Members no longer have the private amenities promised by Developer Defendants, have significantly less parkland than promised due to Developer Defendants' scheme, and have significantly fewer CFD Funds with which to improve Eastmark. These

actions have also caused Class Members to suffer an overall degradation in quality of life as Eastmark residents. These actions have also caused Class Members to suffer a loss in property value and an overall degradation in quality of life as Eastmark residents.

95.     There is a significant connection between Developer Defendants' enrichment and Plaintiffs' and Class Members' impoverishment. It was Developer Defendants' pursuit of ill-gotten profits that caused Class Members to lose parkland, private amenities, and CFD Funds. Moreover, the ECA admitted it would not have granted the easements (which harmed Class Members) without knowing that Developer Defendants would receive CFD Funds for their costs of constructing the Skate Park and Disc Golf Course.

96.     There is no justification for Defendants' enrichment because it was only possible by contravening numerous representations made by Developer Defendants to Plaintiffs and Class Members.

97.     Plaintiffs and Class Members have no adequate remedy at law.

## CLAIM III
## Breach of Duty
## Against Board Defendants

98.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

99.     During some or all relevant times hereto, Board Defendants served on the ECA Board and owed ECA members duties under Arizona statutes and the Restatement (Third) of Property (Servitudes). These duties create a special relationship of trust and confidence between ECA directors and Class Members.

100.    Board Defendants were required to, among other things, discharge their duties:

(a) in good faith;

(b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances;

(c) in a manner that is reasonably believed to be in the best interests of the ECA and its members; and

(d) to deal fairly with ECA members.

101.    Board Defendants breached their duties to Plaintiffs and the Class Members, failed to act in good faith, failed to use ordinary care and prudence in managing the ECA land, failed to act in a manner reasonably believed to be in the best interests of Class Members, and/or failed to deal fairly with Class Members by:

(a) placing a public easement over the Skate Park and Disc Golf Corse without receiving any compensation for Class Members;

(b) assuming obligations to operate and maintain large portions of the Great Park without receiving any compensation for Class Members;

(c) working to ensure Developer Defendants received CFD Funds for the cost of constructing the Skate Park and the Disc Golf Course; and

(d) concealing, failing to timely disclose, and failing to provide Class Members with information about (i) the actual intended location of the Great Park; (ii) ramifications of Developer Defendants' sale of more than 40 acres of Great Park land to developers; (iii) the combined size of the Great Park and ECA land; and (iv) Developer Defendants' decision to misappropriate the ECA land and amenities.

102.    Board Defendants engaged in their breaches of duty for their own personal benefit and/or the benefit of Developer Defendants, which appointed all Board Defendants and employ or employed all or virtually all of the Board Defendants.

103.    As a result of the Board Defendant's conduct, Plaintiffs and Class Members suffered damages.

## CLAIM IV
### Aiding and Abetting Breach of Duty
### Against Developer Defendants

104.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

105.    Developer Defendants aided and abetted the Board Defendants' breaches of duty owed to Plaintiffs and Class Members.

106.    Board Defendants owed Plaintiffs and Class Members certain duties under Arizona statutes and the Restatement (Third) of Property (Servitudes), which created a special

relationship of trust and confidence between ECA directors and Class Members. As discussed in the preceding section, by committing the acts alleged herein, Board Defendants breached their duties.

107.    At all times relevant hereto, and at the time of filing this action, Developer Defendants have and continue to control the Board Defendants and the ECA Board. Developer Defendants have had the sole power to appoint ECA Board members since its inception. All or nearly all the Board Defendants serve or served as high-ranking employees with Defendants Brookfield Residential Properties ULC, Brookfield Residential (Arizona) LLC, and/or their affiliates. Developer Defendants and Board Defendants have admitted on numerous occasions, including at board meetings, that the Board Defendants act as directed by Developer Defendants and will not act contrary to those directives even if they conflict with the interests of ECA members.

108.    As a direct result of the aiding and abetting by Developer Defendants, Plaintiffs and Class Members suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in Plaintiffs' favor and in favor of the Class against Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action;

B.    Declaring and decreeing that the Board Defendants breached their duties to Class Members;

C.    Declaring and decreeing that the Developer Defendants aided and abetted the Board Defendants' duty breaches;

E.    Declaring and decreeing that Developer Defendants were unjustly enriched through their scheme;

D.    Awarding damages to Plaintiffs and the Class, including pre-and post-judgment interest to the extent permitted by law;

E.    Permanently enjoining Defendants from converting any additional private parkland or amenities to public amenities and/or Great Park acreage;

G.    Permanently enjoining Defendants from obtaining any additional CFD Funds for costs associated with developing land that is not owned, operated and maintained by the City of Mesa;

H.    Reversing Defendants' conversion of private amenities and private parkland to Great Park land, including voiding the public easements granted over the Skate Park and Disc Golf Course;

I.    Awarding Plaintiffs attorney fees, expenses, and taxable costs to the extent permitted by law; and

J.    Granting Plaintiffs and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED this 17th day of July, 2023.

KELLER ROHRBACK L.L.P.

By */s/ Gary A. Gotto*

Gary A. Gotto
Ron Kilgard
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
*ggotto@kellerrohrback.com*
*rkilgard@kellerrohrback.com*

Daniel J. Mogin (*pro hac vice pending*)
Timothy Z. LaComb (*pro hac vice pending*)
MOGINRUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
*dmogin@moginrubin.com*
*tlacomb@moginrubin.com*

Attorneys for Plaintiffs