**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Monica Miller, et al., | No. CV-23-01402-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| DMB Mesa Proving Grounds LLC, et al., | |
| Defendants. | |

This matter stems from the alleged misgovernance of Eastmark, a master-planned community in Mesa, Arizona (the "Eastmark Community" or "Community"). Plaintiffs Monica Miller, Travis Miller, Rachel Archibald, Dirk Shupe, Brinton-Rodriguez, and Osvaldo Rodriguez (collectively "Plaintiffs") are all Eastmark Community homeowners. (Doc. 1 at ¶¶ 16–18). Defendants DMB Mesa Proving Grounds LLC ("DMB Mesa"), DMB Associates, Inc., DMB/Brookfield Eastmark LLC, Brookfield Eastmark LLC, Brookfield Residential (Arizona) LLC, and Brookfield Residential Properties ULC (together the "Developer Defendants") jointly own and develop the Eastmark Community. (*Id*. at ¶ 2). The Eastmark Community Alliance ("ECA") is an Arizona nonprofit corporation that was established to govern the Eastmark Community. (Doc. 31-2 at 10). Defendants Christina Christian, Holley Crea, Paul Lillis, Tom Bongiorno, and Eric Tune are all present or former officers of the ECA Board of Directors (together the "Board Defendants"). (Doc. 1 at ¶ 25)[1].

---

[1] Plaintiffs represent that each Board Defendant was appointed by the Developer Defendants and either serve or served as high-ranking employees with Defendants

Pending before the Court are two Motions to Dismiss (Docs. 31; 32)[2] filed by the Developer Defendants and the Board Defendants (collectively "Defendants") respectively. Defendants seek to dismiss Plaintiffs' Class Action Complaint (Doc. 1)[3] under Federal Rule of Civil Procedure 12(b)(1) and compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA"). Also before the Court is Plaintiffs' "Notice of Supplemental Authority Regarding Defendants' Motions to Compel Arbitration" (Doc. 51) citing *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024). The Court must decide whether Plaintiffs entered into a valid and enforceable arbitration agreement and whether Plaintiffs' claims fall within the scope of that agreement. For the following reasons, the Court grants Defendants' Motions and compels Plaintiffs to arbitrate their claims individually.

## I.     Background

Below is a summary of the contracts Plaintiffs entered into when purchasing homes, the relevant development plans of the Eastmark Community, and the procedural history of the present matter.

### A.     Plaintiffs' Contracts When Purchasing Homes in Eastmark Community

Plaintiffs purchased homes in the Community between 2019–2021 and became members of the ECA. (Doc. 1 at ¶¶ 16–18). Defendant DMB Mesa executed the 2013 "Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements for East Mark" (Doc. 32-1) (the "CC&Rs"), which govern the development, administration, maintenance, preservation, and future expansion of the Community.

---

Brookfield Residential Properties ULC, Brookfield Residential (Arizona) LLC, and/or their affiliates. (Doc. 1 at ¶ 11).

[2] The matters are fully briefed. (*See* Docs. 37 (Plaintiffs' Response); 38 (Developer Defendants' Reply); 40 (Board Defendants' Reply); 48 (Plaintiffs' Sur-reply)). The Board Defendants' Motion adopts and fully incorporates the Developer Defendants' Motion to Dismiss. (*See* Doc. 32).

[3] Plaintiffs seek to bring this class action under Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and the following putative class: "All persons or entities that purchased a property for residential use in Eastmark prior to January 31, 2022 (the 'Class Period') and continue to hold that property, other than persons or entities that purchased a property on land designated for the Great Park by the Great Park Master Plan. Excluded from the Class are Defendants, their subsidiaries, affiliates, and employees." (Doc. 1 at ¶ 29).

(*Id*. at 10).  According to its choice-of-law provision, the CC&Rs "shall be governed and construed under and enforced in accordance with the laws of the State of Arizona." (*Id*. at 45).  The CC&Rs designate the ECA as responsible for carrying out the governance structure of the Community, and the ECA's affairs are conducted by the ECA Board of Directors (the "ECA Board").  (*Id*. at 10, 17).  Defendant DMB Mesa recorded all past and current versions of the CC&Rs with the Maricopa County Recorder's Office and published them on the Community's website.  (Docs. 31-2 at 7–8; 37-3 at ¶ 5).  The CC&Rs were referenced or otherwise incorporated into the group of documents that Plaintiffs received at the time of their home purchases.  (Docs. 37-2 at ¶ 4; 37-4 at ¶ 8).  However, Plaintiffs claim they did not agree the CC&Rs' terms.

Most relevant to Defendants' Motions is the CC&Rs' dispute resolution procedure:

> 11.2 Dispute Resolution. Except as set forth below, any dispute arising under th[ese CC&Rs][4] (a "Dispute") shall be governed by the provisions of this Section 11.2.  Each party to the Dispute is hereby deemed to have waived its right to seek a judicial determination of the Dispute. Resolution of the Dispute shall be commenced by any party to the Dispute giving notice of the Dispute (a "Dispute Notice") to the other party(ies).
>
> . . . .
>
> 11.2.3 *Any arbitration of a Dispute shall be conducted in accordance with the Arbitration Rules for the Real Estate Industry of the American Arbitration Association.* The hearing must be held withing thirty (30) calendar days following the date upon which the arbitrator is appointed. The arbitration proceeding shall take place in Phoenix, Arizona. The arbitrator shall afford to the parties a hearing and the right to conduct discovery in accordance with the Arizona Rules of Civil Procedure, submit evidence, with the privilege of cross-examination on the question at issue. The arbitrator shall make a determination in writing and shall give notice to the parties of such determination within ten (10) business days following the hearing. The arbitrator shall assess its fees, all other fees and costs of any such arbitration proceeding and reasonable attorneys' fees against the Party who in the arbitrator's opinion is not the prevailing party.

(Doc. 32-1 at 41–42) ("Section 11.2 Arbitration Agreement" or "Section 11.2") (emphasis

---

[4] The CC&Rs refer to itself as the "Community Declaration."  (Doc. 31-2 at 7).

1    added).

2    **B.    The Eastmark Community Development Plans**

3    Plaintiffs claim they were promised certain development plans upon purchasing

4    their homes.  They say that, based on an agreement between Defendant DMB Mesa and

5    non-party City of Mesa, the Developer Defendants represented that the Community would

6    include a one-hundred-and-six-acre public park (the "Great Park") and fifty acres of private

7    parkland comprised of a Disc Golf Course and Skate Park as private amenities for ECA

8    members. (Doc. 1 at ¶¶ 3, 48–50).  As ECA members, Plaintiffs paid special fees and taxes

9    when they purchased their homes as contribution to the development plans and the

10    community facility district funds.  (*Id*. at ¶¶ 41–42).

11    According to Plaintiffs, the Great Park was being developed as promised when

12    Defendant DMB ran the day-to-day operations, but there was a significant deviation when

13    Defendant Brookfield Residential (Arizona) LLC took over leadership on January 1, 2018.

14    (*Id*. at ¶ 55).  That is when the Developer Defendants allegedly sold forty acres of

15    Great Park land to residential homebuilders and converted twenty-five acres of private

16    parkland into Great Park land, thereby reducing the promised size of the ECA members'

17    private amenities. (*Id*. at ¶¶ 55, 58–59, 64–69).  Although Defendants held public meetings

18    following the disclosure of the revised development plans, Plaintiffs claim Defendants

19    disregarded their concerns of false statements and misrepresentation of development plans.

20    (*Id.* at ¶¶ 64, 66).

21    **C.    Procedural History**

22    Plaintiffs filed a Class Action Complaint asserting four Claims based on

23    Defendants' actions when developing the Community:

24    Claim I alleges the Developer Defendants were unjustly enriched when they
      sold forty acres of Great Park land without satisfying their obligations to
25    Class Members concerning the Great Park, private parkland, private
      amenities (*id.* at ¶¶ 85–90);
26

27    Claim II alleges the Developer Defendants were unjustly enriched when they
      received CFD Funds provided by Class Members without constructing the
28

promised private amenities for ECA members (*id.* at ¶¶ 91–97);

Claim III alleges the Board Defendants breached their duties owed to Plaintiffs because they failed to act in good faith, failed to use ordinary care and prudence in managing the ECA land, and failed to act in the best interests of Class Members by allowing maldevelopment of the Eastmark Community (*id.* at ¶¶ 98–104); and

Claim IV alleges the Developer Defendants aided and abetted the Board Defendants' breach of duty by controlling the ECA Board and overlooking conflicts of interest among ECA officers (*id.* at ¶¶ 104–108).

Defendants have moved the Court to dismiss Plaintiffs' Class Action Complaint and compel them to arbitration according to the Section 11.2 Arbitration Agreement contained in the CC&Rs.  (*See generally* Docs. 31; 32).

## II.    Subject Matter Jurisdiction and the Federal Arbitration Act

Defendants argue this matter should be dismissed under Rule 12(b)(1)[5] because this Court lacks jurisdiction to hear Plaintiff's claims under the FAA.  The FAA governs the enforceability of arbitration agreements in contracts involving interstate commerce, such as the CC&Rs.[6]  *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013); *see also* 9 U.S.C. § 2.  The FAA permits "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is a "procedurally sufficient mechanism to enforce an arbitration provision."  *ROI Properties Inc. v. Burford Cap. Ltd.*, 2019 WL 1359254, *2

---

[5] Unless where otherwise noted, all Rule references are to the Federal Rules of Civil Procedure.

[6] Developer Defendants represent the CC&Rs constitute a contract involving interstate commerce because the CC&Rs govern the development of the Eastmark Community, which involves hiring, coordinating, and transacting with interstate developers and materials. (Doc. 31 at 14 (citing *U.S. Home Corp. v. Michael Ballesteros Tr.*, 415 P.3d 32, 39 (Cal. 2018) ("[T]ransactions underlying the CC&Rs' arbitration agreement—the construction and sale of multiple homes by out-of-state contractors using out-of-state supplies and suppliers—affect interstate commerce, meaning the FAA controls.")). Plaintiffs do not argue otherwise.  (*See generally* Doc. 37).

(D. Ariz. Jan. 14, 2019).  While the scope of an arbitration provision is determined by applying federal law, whether there is a valid agreement to arbitrate is determined "by applying general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Wagner v. Stratton Oakmont*, Inc., 83 F.3d 1046, 1049 (9th Cir. 1996).  Therefore, the Court will apply Arizona law where necessary according to the CC&Rs' choice-of-law provision.  (*See* Doc. 31-2 at 45).  "[T]he party seeking to compel arbitration has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence."  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 564 (9th Cir. 2014).

When assessing a motion to compel a party to arbitration, the FAA narrows the district court's review to the following "gateway issues": (1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement encompasses the dispute at issue. *Chiron Corp v. Ortho Diagnostic Sys., Inc.*, 2017 F.3d 1126, 1130 (9th Cir. 2000).  When a district court finds in the affirmative on both gateway issues, then the FAA requires the court to uphold the arbitration agreement and compel arbitration in accordance with its terms.  *Id.* at 1130.  However, if genuine disputes of material fact exists as to whether the parties entered into an agreement under the first gateway issue, then the court should proceed by applying a standard similar to the summary judgment standard of Rule 56. *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).  When a motion to compel arbitration is opposed on the ground that no agreement to arbitrate was made, "a district court should give the opposing party the benefit of all reasonable doubts and inferences that may arise."  *Id.*  While the gateway questions are normally resolved by the courts, parties may contract for the arbitrator resolve some of these gateway issues through a "delegation" provision so long as the parties "*clearly and unmistakably* provide" that the "gateway issues . . . be expressly delegated to the arbitrator."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (emphasis in original) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).  If the parties did not agree to

1   submit the gateway issues to arbitration, then the court should decide those questions

2   independently. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

3   **III.    Discussion**

4         Defendants argue the CC&Rs' Section 11.2 Arbitration Agreement is valid and

5   enforceable under the first gateway issue. (Doc. 31 at 13–14). Defendants further argue

6   the issue of whether Plaintiffs' claims are subject to Section 11.2 under the second gateway

7   issue has been delegated to the arbitrator, and thus the Court need not resolve it. (*Id.* at 19–

8   20). Defendants posit that when delegation is raised, "the court's role is narrowed from

9   deciding whether there is an applicable arbitration agreement to only deciding whether

10  there is a valid delegation clause." (Doc. 40 at 4 (quoting *Khraibut v. Chahal*, 2016 WL

11  1070662, at *3 (N.D. Cal. Mar. 18, 2016)). Even so, Defendants argue Plaintiffs'

12  underlying claims arise under the CC&Rs and so are arbitrable. (Doc. 31 at 15–18).

13        To clarify the issues that the Court must decide, the Court first will address whether

14  the parties have sufficiently delegated resolution of the question of arbitrability to the

15  arbitrator. Finding they have not, the Court must proceed to analyze each gateway issue in

16  turn.

17        **A.    Whether the Issue of Arbitrability has been Delegated to the Arbitrator**

18        Defendants contend Section 11.2 delegates the question of arbitrability to the

19  arbitrator for two reasons. First, they cite Section 11.2's language stating that "[e]ach party

20  to the Dispute is hereby deemed to have waived its right to seek a judicial determination

21  of the Dispute." (Doc. 38 at 7). Second, they assert that although Section 11.2 states all

22  arbitrations shall be governed the Arbitration Rules for the Real Estate Industry of the

23  American Arbitration Association ("AAA")—which *do not* include an express delegation

24  clause—the AAA Real Estate Industry Rules have since been archived and supplanted by

25  the AAA Commercial Arbitration Rules—which *do* include an express delegation clause.[7]

26  ─────────────────
    [7] Rule R-7(a) of the AAA Commercial Arbitration Rules states that "[t]he arbitrator shall
27  have the power to rule on his or her own jurisdiction, including any objections with respect
    to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any
    claim or counterclaim." American Arbitration Association, Commercial Arbitration
28  Rules and Mediation Procedures (Am. Oct. 1, 2013),
    https://adr.org/sites/default/files/Commercial%20Rules.pdf.    The AAA Real Estate

(Docs. 38 at 7–8; 40 at 5).  Defendants thus reason that Plaintiffs are subject to the current AAA Commercial Arbitration Rules, including the delegation clause therein.  *Id.*  Plaintiffs oppose, arguing Defendants cannot show they clearly and unmistakably agreed to delegate arbitrability by agreeing to the AAA Commercial Arbitration Rules because those rules were not expressly referenced in the CC&Rs and Plaintiffs did not know the AAA Real Estate Rules were later supplanted by the those rules.  (Doc. 48 at 3–4, 7–8).

In short, the Court must decide whether the CC&Rs' incorporation of the now-archived AAA Real Estate Industry Rules clearly and unmistakably delegated the second gateway issue arbitrability to the arbitrator through the delegation clause included in the now-effective AAA Commercial Arbitration Rules.

### 1. Legal Standards for Delegation Clauses

The United States Supreme Court has recognized that parties may delegate resolution of the gateway issues to an arbitrator by incorporating a "delegation clause" in the underlying arbitration agreement.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *see also See Coinbase*, 144 S. Ct. at 1192–93.  "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Rent-A-Center*, 561 U.S. at 70.  For a delegation clause to effectively delegate the question of arbitrability under federal law, the parties must contract so "clearly and unmistakably."  *Id.* at 78; *Kaplan*, 514 U.S. at 943 ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so").  However, whether the parties' agreement incorporates by reference an extrinsic delegation clause is an issue of contract formation that arises under state contract law.  *Goceri v. Amazon.com, Inc.*, 2024 WL 1007868, *3 n.1 (N.D. Cal. Mar. 8, 2024) (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022)); *see also Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014) ("When determining whether a valid contract to arbitrate exists, we apply ordinary

---

Industry Rules do not contain a comparable Rule.

state law principles that govern contract formation.").  "Under Arizona law, a contracting party agrees to terms and conditions in an extrinsic document if the agreement being executed clearly and unequivocally refers to the extrinsic document, the party consents to the incorporation by reference, and the terms of the incorporated document are 'known or easily available to the contracting parties.' "  *Edwards v. Nutrition*, 2018 WL 637382, at *3 (D. Ariz. Jan. 31, 2018) (quoting *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 420 (Ariz. Ct. App. 1983)).

### 2.    Section 11.2 Does Not Include Clear and Unmistakable Evidence of Delegation

Defendants cite to *Brennan v. Opus Bank* for the proposition that Section 11.2's reference to AAA rules with "no further or more specific instruction" constitutes "sufficient evidence of delegation."  (Doc. 31 at 19 (citing 796 F.3d at 1130)).  At issue in *Brennan* was an arbitration agreement that stated, "any controversy or claim arising out of this Employment Agreement or [the plaintiff's] employment with the [defendant] or the termination thereof . . . shall be settled by binding arbitration in accordance with the Rules of the American Arbitration Association."  796 F.3d at 1128.  The Ninth Circuit held the agreement's express incorporation and general reference to the AAA rules served as clear and unmistakable evidence that the parties agreed to arbitrate the issue of arbitrability.  *Id.* at 1130 (citing *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069 (9th Cir. 2013)).  The circuit court reasoned that such reference to the AAA rules allowed the defendants to invoke the delegation clause recognized by various bodies of AAA rules, which provides that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the . . . validity of the arbitration agreement."  *Id.*

The Court finds the present matter involves facts that are distinct from *Brennan*.  Unlike the arbitration agreement's general reference to the AAA rules in *Brennan*, Section 11.2 clearly identifies a particular body of AAA rules to apply—that is, the AAA Real Estate Industry Rules.  (Doc. 31-2 at 42).  And, as pointed out by Plaintiffs, the AAA Real Estate Industry Rules do not recognize the delegation clause that the Ninth Circuit

applied in *Brennan*.  Moreover, Section 11.2's referenced AAA Real Estate Industry Rules have since been archived and supplanted by the AAA Commercial Arbitration Rules.[8]  (*Id.*)  Plaintiffs argue they cannot be bound by the AAA Commercial Arbitration Rules' delegation clause as Defendants suggest because Plaintiffs neither agreed to the AAA Commercial Arbitration Rules at the time they purchased their homes nor had notice that Section 11.2 would incorporate these new rules in the event the AAA Real Estate Rules were archived.  (Doc. 48 at 3–4).  Plaintiffs further assert Defendants cannot provide any evidence showing Plaintiffs were aware of the change in AAA rules when Defendants themselves were not aware until recently.  (*Id.* at 4).  Because the Ninth Circuit has not yet opined on circumstances involving an arbitration agreement's reference to a body of archived AAA rules that do not include a delegation clause, the Court will look to other district courts within this circuit for guidance.

Although not factually identical, the Court finds *Dembiczak v. Fashion Nova. LLC* instructive.  2024 WL 580701 (W.D. Wash. Feb. 13, 2024).  There, the Washington District Court analyzed an arbitration agreement that incorporated indiscernible AAA rules.  The arbitration agreement at issue read that "arbitration will be conducted in accordance with the provisions of the AAA's Commercial Dispute Resolutions Procedures, Supplementary Procedures for Consumer-Related Disputes."  *Id.* at *5.  However, the AAA never maintained rules under that specific title and there were multiple versions of similarly titled AAA rules.  *Id.*  The district court held that "although incorporation of AAA rules often constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability, that is not true where the contract at issue incorporates nonexistent or indiscernible AAA rules."  *Id.*  The district court reasoned the parties could not have clearly and unmistakably agreed to the AAA rules when the plaintiff was unaware of them, could not easily find them, and was unclear which AAA rules supplanted the nonexistent rules.

---

[8] Although the AAA does not provide clear notice on which rules apply or how a court should evaluate archived rules, Defendants submitted Declaration of Marsha Cotton (Doc. 41-1) which includes an email from an AAA representative. The email states "when a case is filed, and the arbitration clause specifies an archived-discontinued- set of rules the AAA will assign an active set of rules to the case – typically the Commercial Arbitration Rules."  (*Id.* at 4).

1    *Id.* The district court further emphasized that a consumer must receive notice of the terms

2    to which she will be bound. *Id*. at *5.

3    The Court finds the reasoning in *Dembiczak* relevant to the present matter.

4    Although Section 11.2 does not refer to mistitled AAA rules, its reference to the AAA Real

5    Estate Industry Rules creates uncertainty because the parties must reconcile that those rules

6    are now archived and no longer in effect.  For example, Section 11.2 does not indicate

7    whether it meant to incorporate currently effective AAA rules rather than the version in

8    effect at the time of the agreement.  Moreover, the Arizona incorporation-by-reference

9    doctrine requires consumers, like Plaintiffs, to receive notice of the extrinsic terms to which

10   they will be bound. *Edwards*, 2018 WL 637382, at *3; *Prudential Ins. Co. of Am.*, 681

11   P.2d at 420.  Section 11.2 does not expressly reference the AAA Commercial Arbitration

12   Rules, nor is there evidence demonstrating Plaintiffs had notice that the AAA Commercial

13   Arbitration Rules later supplanted the AAA Real Estate Industry Rules.  In light of these

14   circumstances, the Court rejects Defendants' argument that Section 11.2's reference to the

15   AAA Real Estate Industry rules constituted clear and unmistakable evidence of delegation

16   through the AAA Commercial Arbitration Rules' delegation clause.  Notwithstanding the

17   general principle that the AAA decides which rules should apply (Doc. 39 at ¶ 4), the

18   uncertainty posed by the archived AAA Real Estate Industry Rules combined with

19   Plaintiff's lack of notice of the AAA Commercial Arbitration Rules' delegation clause

20   prevents the Court from finding the parties agreed to delegate  arbitrability to the arbitrator.

21   *See Dembiczak*, 2024 WL 580701, at *5 (citing *Berman*, 30 F.4th at 855–56);  *see also,*

22   *e.g.*, *Goceri*, 2024 WL 1007868, at *4 (holding that "uncertainty over which set of [AAA]

23   rules is referenced in the parties' agreement prevents [the c]ourt from concluding that [the

24   defendant] has satisfied its burden . . . to establish the incorporation of a specific set of

25   rules incorporating a delegation provision into the parties' agreement"); *Cristales v. Scion*

26   *Grp. LLC*, 478 F. Supp. 3d 845 (D. Ariz. 2020) (finding that when an arbitration agreement

27   provided disputes shall be settled according to the Commercial Arbitration Rules of the

28   U.S. Arbitration & Mediation Rules *or* the AAA, this did not constitute unmistakable

1  evidence that the parties intended to delegate arbitrability because while Rule 7(a) of the
2  AAA Commercial Arbitration Rules set forth a delegation clause, the U.S. Arbitration &
3  Mediation Rules were not clear and unambiguous on delegation).

4         In sum, the Court finds Section 11.2 did not clearly and unmistakably delegate
5  arbitrability to the arbitrator.  The Court must now proceed to independently determine
6  each gateway issue.  *Kaplan*, 514 U.S. at 943.

   **B.     Gateway Issue One: Whether A Valid and Enforceable Arbitration
7           Agreement Exists**
8

9         The first gateway issue looks to whether the Section 11.2 Arbitration Agreement is
10 valid and enforceable against Plaintiffs.  The initial inquiry begins with deciding whether
11 the parties have mutually formed the contract in which the arbitration provision is included.
12 *See Coinbase*, 144 S. Ct. at 1192.  Whether there is a valid agreement to arbitrate is
13 determined "by applying general state-law principles of contract interpretation, while
14 giving due regard to the federal policy in favor of arbitration by resolving ambiguities as
15 to the scope of arbitration in favor of arbitration."  *Wagner*, 83 F.3d at 1049.  Agreements
16 to arbitrate may be "invalidated by 'generally applicable contract defenses, such as fraud,
17 duress, or unconscionability,' but not by defenses that apply only to arbitration or that
18 derive their meaning from the fact that an agreement to arbitrate is at issue."  *AT&T*
19 *Mobility LLC*, 563 U.S. at 339 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681,
20 687 (1996)).  Absent a valid contract defense, the FAA "leaves no place for the exercise of
21 discretion by a district court, but instead mandates that district courts shall direct the parties
22 to proceed to arbitration on issues as to which an arbitration agreement has been signed."
23 *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

24        The Developer Defendants argue Plaintiffs' claims are subject to the Section 11.2
25 Arbitration Agreement contained in the CC&Rs, which were incorporated by the contracts
26 that Plaintiffs entered into when purchasing homes. (Docs. 31 at 16; 38 at 12,14).  "In
27 Arizona, a recorded declaration that contains restrictive covenants common to all
28 properties in a development *forms* a contract between 'the development's property owners

as a whole and the individual lot owners.' " *Johnson v. Pointe Community Ass'n, Inc.* 73 P.3d 616, 620 (Ariz. Ct. App. 2003) (emphasis added) (quoting *Ariz. Biltmore Estates Ass'n v. Tezak*, 868 P.2d 1030,1031 (Ariz. Ct. App. 1993)). Here, Defendant DMB Mesa executed and recorded the CC&Rs with the Maricopa County Recorder's Office, which set forth various covenants, conditions, restrictions and easements that apply to the Eastmark Community. (Doc. 31 at 9). So, as a threshold matter, the Court finds Plaintiffs were bound by the CC&Rs when purchasing their homes.

The remaining question is whether the Section 11.2 Arbitration Agreement contained in the CC&Rs is enforceable. Plaintiffs argue Section 11.2 is not enforceable under Arizona's procedural unconscionability, substantive unconscionability, and reasonable expectation doctrines. (Doc. 37 at 15, 26). Plaintiffs further contend that, other than Defendant DMB Mesa, the remaining Defendants are not parties to the CC&Rs and so cannot enforce Section 11.2 against Plaintiffs as non-signatories. The Court will examine each of Plaintiffs' arguments below.

### 1.    Section 11.2 is not Procedurally Unconscionable

Plaintiffs first argue the CC&Rs are void under the doctrine of procedural unconscionability because "there was no real and voluntary meetings of minds" and the contract was a "take-it-or-leave it" requisite document to purchasing their homes in Eastmark. (Doc. 37 at 15–17). (*Id.*) Plaintiffs also take issue with the Section 11.2 Arbitration Agreement's lack of visual emphasis, noting the provision is "lodged on page 35 of a 41-page single-spaced, 11.5-point font document . . . runs 31 lines of type, none of which is in capital letters, boldface, or italics." (*Id.* at 17). While Plaintiffs admit that the CC&Rs were referenced or otherwise incorporated into the group of documents they received (Docs. 37-2 at ¶ 4; 37-4 at ¶ 8), Plaintiffs argue Section 11.2 was buried in CC&Rs, which were buried in the stack of closing papers, such that Plaintiffs had no realistic opportunity to review and understand it. (Doc. 37 at 15–17). Lastly, Plaintiffs argue the CC&Rs were inaccessible because Section 11.2 was written in real estate legalese and is incomprehensible. (*Id.* at 17–18). Defendants oppose, contending Plaintiffs received

constructive notice of the terms in the CC&Rs as they are publicly available and recorded at Document No. 2011 05877857 of the official records of Maricopa County, Arizona. (*See* Doc. 38 at 9). The Court agrees with Defendants.

The Arizona Court of Appeals defines procedural unconscionability as addressing the fairness of the bargaining process and is "mostly concerned with 'unfair surprise [on the contracting party], fine print clauses, ignorance of important facts or other things that mean bargaining did not proceed as it should.' " *Duenas v. Life Care Centers of America, Inc.* 336 P.3d 763, 768 ( Ariz. Ct. App. 2014) (quoting *Clark v. Renaissance West, LLC.*, 307 P.3d 77, 79 (Ariz. Ct. App. 2013). Factors relevant to determining procedural unconscionability include the contracting party's capacity, age, education, whether terms of contract were available, and whether the contract was separate from other paperwork. *Id.* To assess for procedural unconscionability in this case, the Court must look to the specific circumstances in which each Plaintiff bargained for their home purchases. *Id.*

### a.    Plaintiff's Capacity to Enter into the CC&Rs

Each Plaintiff submitted a declaration that, among other things, explains the manner in which they became aware of the CC&Rs:

- Plaintiff Monica Miller represents she became aware of the CC&Rs at the time of closing on her home as it was referenced in a master disclosure statement, but the CC&Rs were not made available her. (Doc. 37-2 at ¶ 5). In 2020, she reviewed the CC&Rs after realizing the community was not developing as it had been represented and alleges to not have seen an arbitration agreement. (*Id.*) Furthermore, she claims that even after reading the CC&Rs in full, much of it was incomprehensible due to the legalese and contradictory statements of governing documents. (*Id.* at ¶ 6). After reading the arbitration agreement, she claims she did not agree to it because it was never called to her attention during the purchase of her home. (*Id.*)

- Plaintiff Travis Miller represents he became aware of the CC&Rs in 2020 after noticing the development of Great Park was not aligning with representations on the Eastmark website, in the Community Plan, and in descriptions provided to him when he purchased his home. (Doc. 37-3 at ¶ 5). He accessed the CC&Rs online and found the document to be incomprehensible. (*Id.* at ¶ 6). He further alleges there is no evidence that he received the CC&Rs in advance of purchasing his home, the arbitration

agreement was never called to his attention, and he never agreed to the provisions. (*Id.*)

- Plaintiffs Rachel Archibald and Dirk Shupe claim they became aware of the CC&Rs in 2020 when their real-estate representative told them it was a fee they were to pay upfront for the City of Mesa to deliver utilities and similar resources to Eastmark. (Docs. 37-4 at ¶ 8; 37-5 at ¶ 8). They claim the CC&Rs were never clearly explained to them, other than it being a mandatory fee they paid for utilities. (*Id.*) Additionally, they allege their homebuilder sent them a group of documents, which they e-signed, without alerting them of an arbitration agreement. (*Id.*) After reading the CC&Rs, they claim the document is incomprehensible and that they never agreed to arbitrate under Section 11.2. (Docs. 37-4 at ¶ 10; 37-5 at ¶ 10).

- Plaintiffs Breanna Brinton-Rodriguez and Osvaldo Rodriguez allege they were never made aware of the CC&Rs and only read them for the first time in preparation for their declarations. (Doc. 37-6 at ¶ 8). After reading the CC&Rs, Plaintiff Breanna Brinton-Rodriguez represents the document is incomprehensible, Section 11.2 was never called to her attention, and she did not agree to it. (*Id.* at ¶ 10).

Plaintiffs are all college-educated-individuals. (Docs. 37-2 at ¶ 2; 37-3 at ¶ 2; 37-4 at ¶ 2; 37-5 at ¶ 2; 37-6 at ¶ 2; 37-7 at ¶ 2). Before any Plaintiff purchased their homes in the Eastmark Community, Defendant DMB Mesa executed and recorded the CC&Rs with the Maricopa County Recorder's Office. (Doc. 31 at 9). The parties appear to agree the CC&Rs, at minimum, was an extrinsic document to Plaintiffs' home purchases.

   **b.    Plaintiffs' Had Adequate Notice and Access to the CC&Rs**

As mentioned, Arizona's incorporation-by-reference doctrine recognizes that a contracting party agrees to the terms and conditions in an extrinsic document "if the agreement being executed clearly and unequivocally refers to the extrinsic document, the party consents to the incorporation by reference, and the terms of the incorporated document are 'known or easily available to the contracting parties.'" *Edwards*, 2018 WL 637382, at *3 (quoting *Prudential Ins. Co. of Am.*, 681 P.2d at 420)). And "[i]t is the general rule that the grantee, with notice of restrictive covenants, who accepts a deed referring to those restrictions is deemed to assent to be contractually bound by the

restrictions . . . ." *Pinetop Lakes Ass'n v. Hatch*, 659 P.2d 1341, 1343 (Ariz. Ct. App. 1983).  Here, it is undisputed that Plaintiffs either had knowledge of the CC&Rs through its reference in master documents or upon accessing them on the Eastmark Community public website.  (Docs. 37-2 at ¶ 5; 37-3 at ¶ 6; 37-4 at ¶ 8; 37-5 at ¶ 8).  The Court agrees with the Defendants that, through individually purchasing their homes, Plaintiffs contractually agreed to abide by the CC&Rs as is custom when purchasing a home in a planned community.  *Pinetop Lakes Ass'n*, 659 P.2d at 1343.  Plaintiffs' claimed lack of knowledge of Section 11.2 is not contributed to the unavailability of the CC&Rs or the unfairness in the bargaining process on the part of the Developer Defendant.  So, the Court finds Plaintiffs cannot claim unfair surprise or ignorance as required under the procedural unconscionability doctrine.  *See Duenas*, 336 P.3d at 768.

Overall, the Court finds the Developer Defendants provided adequate notice of the CC&Rs to Plaintiffs and did not unfairly surprise Plaintiffs with the Section 11.2 Arbitration Agreement therein. Section 11.2 is not procedurally unconscionable.

### 2.    Section 11.2 is not Substantive Unconscionable

Plaintiffs next argue the Section 11.2 Arbitration Agreement should not be enforced because the CC&Rs are substantively unconscionable.  Arizona's substantive unconscionability doctrine addresses the terms of the contract in addition to the relative fairness of the obligations assumed. *Duenas,* 336 P.3d at 769.  The doctrine looks to "whether the contract terms are so one-sided as to oppress or unfairly surprise an innocent party, whether there is an overall imbalance in the obligations and rights imposed, and whether there is a significant cost-price disparity." *Id.*  Plaintiffs argue substantive unconscionability based on (1) the implications of the Section 11.1 Enforcement provision on the Section 11.2 Arbitration Agreement; and (2) the Section 9.3 Modification of Community provision.

### a.    Sections 11.1 and Section 11.2

The Section 11.1 Enforcement provision states the following:

The [ECA] Board and [Defendant DMB Mesa][9] exclusively (and not any individual Owner, Permittee or Occupant) shall have the right to enforce the provisions of [these CC&Rs]. In connection with such enforcement, the [ECA] Board or [Defendant DMB Mesa] (as applicable) shall be entitled to recover court costs and reasonable attorneys' fees as ordered by the court or other adjudicating body. Failure by the [ECA] Board or [Defendant DMB Mesa] to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter. Notwithstanding the foregoing, (i) any Owner may petition the [ECA] Board in writing requesting enforcement by the [ECA] Board of an asserted violation of any provision of [these CC&Rs], (ii) upon receipt of such petition, the [ECA] Board shall schedule a special meeting regarding the subject of the petition, and provide notice of the special meeting to all affected Owners in accordance with the Bylaws, (iii) after such special meeting, the [ECA] Board shall determine, in its discretion, exercising its reasonable business judgment, whether and how to pursue the subject matter of the petition, and (iv) the [ECA] Board, in its discretion, may permit the petitioning Owner to pursue enforcement of the matter, at the sole expense of such Owner, and may assign to the Owner such rights of the [ECA] as the [ECA] Board may deem appropriate to permit such enforcement. The determination of the Board as to how to proceed with the subject matter of the petition shall be final and binding on all Owners.

(Doc. 31-2 at 41).

In light of these restrictions, Plaintiffs reason the Section 11.2 Arbitration Agreement is one-sided because it requires homeowners to first obtain permission from the ECA Board under Section 11.1 to invoke dispute resolution procedures under Section 11.2. (Doc. 37 at 22).  Defendants oppose, arguing Plaintiffs incorrectly interpret Section 11.1 as it does not prevent Plaintiffs from invoking the dispute resolution procedures all together.  (Doc. 38 at 10–11).  Instead, Section 11.1 provides that in the event the ECA Board refuses to resolve Plaintiffs' dispute, the arbitration procedures outlined in Section 11.2 will then apply.  (*Id.*)  The Court agrees with Defendants because Section 11.1 cannot be read in a vacuum.  *See Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 973 (Ariz. Ct. App. 2010) ("We interpret a contract so that every part is given effect, and each section of

---

[9] The CC&Rs refer to Defendant DMB Mesa as the "Community Declarant."  (Doc. 31-2 at 7).

an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing . . . reading of one provision of a contract must not render a related provision meaningless.")  (internal quotations omitted).  The Section 11.2 Arbitration Agreement unequivocally outlines a fair process for parties in need of resolving a dispute.

Rather, to successfully assert substantive unconscionability of an arbitration agreement, the party challenging arbitration must present specific, non-speculative evidence regarding (1) the probable costs of arbitration, (2) individualized evidence regarding inability to pay costs, and (3) whether arbitration agreement or rules allow for a waiver of cost reduction based on financial hardship.  *Duenas*, 336 P.3d at 769–770.  Here, Section 11.2.2 states, "the cost of any . . . mediation shall be divided equally between or among the parties."  (Doc. 31-2 at 41).  Section 11.2.3 further provides that "the arbitrator shall assess its fees, all other fees, and costs of any such arbitration proceeding and reasonable attorneys' fees against the Party who in the arbitrator's opinion is not eh prevailing party.  (*Id.* at 42).  Plaintiffs have not submitted any evidence demonstrating the costs imposed by Section 11.2 are unreasonable or their inability to pay.  For these reasons, Plaintiffs' substantive unconscionability challenge fails.

### b.    Section 9.3

Plaintiffs also challenge the Section 9.3 Modification of Community provision as substantively unconscionable, which states the following:

> Subject to applicable laws, [Defendant DMB Mesa] reserves the absolute right at any time and from time to time prior to the turnover date to modify the plan for the community. Included in this right is the right of [Defendant DMB Mesa] to construct improvements that are not contemplated by th[ese CC&Rs]. In the event [Defendant DMB Mesa] changes the type, size, nature or timing of construction of the improvements to be constructed upon the property, [Defendant DMB Mesa] shall have no liability thereafter to any Owner or Occupant. In addition, [Defendant DMB Mesa] makes no representations or warranties as to the manner in which any other lands outside the property will be developed, and shall have no liability to any Owner of Occupant regarding the development of any other land in or around the property.

(*Id*. at 17).  Plaintiffs argue the provision unfairly grants Defendant DMB Mesa the absolute right to make any changes they wish to the Eastmark Community development plans, which exonerates them from all liability for any changes made.  (Doc. 37 at 20–21). Plaintiffs further maintain that Section 9.2's "interaction" with Section 11.2 render both provisions substantively unconscionable and thus unenforceable.  (*Id*. at 21).  Defendants contend Section 9.3 cannot reasonably be read as part of the Section 11.2 Arbitration Agreement because it does not relate to the procedure for resolving disputes, and this is further illustrated by the fact that the provisions appear in different sections. (Doc. 38 at 11).

Section 2 of the FAA provides that arbitration agreements in contracts involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]"  9 U.S.C. § 2.  "There are two types of validity challenges under [Section] 2: 'One type challenges specifically the validity of the agreement to arbitrate,' and 'the other challenges the contract as a whole, either on a ground that directly affects the entire agreement . . . or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."  *Rent-A-Center*, 561 U.S. at 70 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)).  The United States Supreme Court has clarified that only the first type of challenge is relevant to a court's determination of whether the arbitration agreement is enforceable.  *Id*.  Under these principles, the Court's assessment of enforceability is limited to whether Section 11.2 is enforceable.  As such, the Court will not review Plaintiffs unconscionability challenge to Section 9.3 because it is outside the scope of that question. Indeed, a party's challenge to another provision (not within the arbitration agreement) of a contract, or to the contract generally, does not prevent a court from enforcing the arbitration agreement.  *Id*. at 70–71.

### 3. Section 11.2 is not Void Under the Reasonable Expectations Doctrine

Plaintiffs go on to argue that Sections 11.1 and 11.2 are unenforceable under

Arizona's reasonable expectations doctrine because no home purchaser would reasonably expect a requirement to seek permission from a counterparty to arbitrate a dispute.[10] (Doc. 37 at 21–22).  Arizona law recognizes the "reasonable expectations" rule of contract interpretation under the Restatement (Second) of Contracts § 211.  *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 396–97 (Ariz. 1984).  The doctrine relieves a party from certain terms of an agreement "[w]here the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term."  *Id*. at 396 (quoting Restatement (Second) of Contracts § 211 (1981)).  This "reason to believe" may be established by the following:

(1)    conduct through prior negotiations,

(2)    "infer[ences] from the circumstances,"

(3)    "infer[ences] from the fact that the term is bizarre or oppressive,"

(4)    evidence of a term that "eviscerated the non-standard terms explicitly agreed to"

(5)    evidence of s term that "eliminated the dominant purpose of the transaction,"

(6)    evidence that a "term would not be understandable to a consumer who attempted to check on his rights," or

(7)    other relevant facts.

*Duenas*, 336 P.3d at 770 (quoting *Harrington v. Pulte Home Corp.*, 119 P.3d 1044, 1050–51 (Ariz. Ct. App. 2005)).  The Arizona Supreme Court applied this doctrine to hold an arbitration agreement was unenforceable when the signatory plaintiff was inexperienced, had high school education, and was emotionally distressed at the time she signed the agreement.  *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 840 P.2d 1013, 1017 (Ariz. 1992).

---

[10] Plaintiffs also argue Section 9.3 is unenforceable under the reasonable expectations doctrine.  However, as explained *supra*, the Court's review is constrained to the enforceability of the Section 11.2 Arbitration Agreement, and the Court need not address Plaintiff's contentions as to Section 9.3.  *See supra* Section III.B(2)(b).

Here, Plaintiffs have not demonstrated sufficient evidence to invoke the reasonable expectation doctrine.  Plaintiffs do not present evidence as to a hurried home purchasing process or that they were under any distress at the time they executed the contracts. Additionally, Plaintiffs are college-educated, and admittedly are "not vulnerable or unsophisticated."  (Doc. 37 at 18).  For these reasons, Plaintiffs challenge under the reasonable expectations doctrine fails.  *See Duenas*, 336 P.3d at 770 (declining to apply the reasonable expectations doctrine because the plaintiff presented no evidence that she was inexperienced, distressed, otherwise vulnerable, or signed the agreements in circumstances akin to duress).

### 4.    The Non-Signatory Defendants May Enforce Section 11.2

Plaintiffs last argue that other than Defendant DMB Mesa, Defendants are not parties to the CC&Rs and so cannot enforce the Section 11.2 Arbitration against Plaintiffs. (Doc. 37 at 23).  Defendants oppose, contending all Defendants may enforce Section 11.2 under long-standing principles of estoppel because they have a close relationship to Defendant DMB Mesa and have been continuously involved in developing the Eastmark Community.  (Doc. 38 at 15).  It is undisputed that the CC&Rs were made by Defendant DMB Mesa.  (*See* Doc. 31-2 at 7).  But, as mentioned *supra*, the Section 11.1 Enforcement provision states "the [ECA] Board and [Defendant DMB Mesa] exclusively . . . shall have the right to enforce the provisions of [these CC&Rs,]" which necessarily includes Section 11.2.  (*Id*. at 41).  So, Section 11.1 expressly authorizes Defendant DMB Mesa *and* the Board Defendants to enforce the Section 11.2 Arbitration Agreement against Plaintiffs.  The remaining question is whether the other Developer Defendants may enforce the arbitration agreement as non-signatories.

Courts apply general contract and agency principles when determining the enforcement of an arbitration agreement by or against nonsignatories, including estoppel. *Mundi v. Union Sec. Life Ins. Co.*, 555 F. 3d 1042, 1045 (9th Cir. 2009) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)).  "Equitable estoppel 'precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the

burdens that contract imposes.' " *Id*. (quoting *Wash. Mut. Fin. Group, LLC v. Bailey,* 364 F.3d 260, 267 (5th Cir. 2004)). The Ninth Circuit has clarified two types of estoppel in the arbitration context. *Id*. Relevant to this case, "a signatory may be required to arbitrate a claim brought by a nonsignatory 'because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatorsy's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations.' " *Id*. at 1045–1046 (quoting *E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F. 3d 187, 269 (3rd Cir. 2001)).

Plaintiffs allege that the "Developer Defendants, through their subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the agent or joint-venturer of or for the others with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties." (Doc. 1 at ¶ 28); (*See also id*. at ¶¶ 19–24). This is further demonstrated through Plaintiffs' allegations that most of the claimed misconduct occurred when Defendant Brookfield Residential (Arizona) LLC took over Defendant DMB Mesa's leadership of day-to-day operations. (*Id*. at ¶ 2). The Court thus finds the remaining Developer Defendants may enforce the Section 11.2 Arbitration Agreement due to their close relationship with Defendant DMB Mesa, the Board Defendants, and the alleged wrongs. *See Mundi*, 555 F. 3d at 1045 (citing *Dupont*, 269 F. 3d at 269).

### 5.    Section 11.2 Does Not Permit Class Arbitration

Having found that Section 11.2 is a valid arbitration agreement that all Defendants may enforce, the Court now turns to Defendants' argument that the terms of Sections 11.2 require Plaintiffs to arbitrate their disputes on an individual basis. (Docs. 31 at 21; 32 at 12). Plaintiffs do not respond to Defendants assertion. (*See generally* Doc. 37). "Neither silence nor ambiguity provides a sufficient basis for concluding that parties to an arbitration agreement agreed to undermine the central benefits of arbitration itself, namely, the individualized form of arbitration envisioned by the FAA." *Shivkov v. Artex Risk Sols.,*

*Inc.*, 974 F.3d 1051 (9th Cir. 2020) (quoting *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186, 184 (2019) (internal citation and quotations omitted).  In light of Section 11.2's silence on class arbitration, the Court finds it is not permitted.  *Id.*  If Plaintiff's claims are arbitrable, the Court will compel individual arbitration.  *Id.*

### 6.    Conclusion

In sum, the Court finds Plaintiffs challenges fail under the procedural unconscionability, substantive unconscionability, and reasonable expectations doctrines.  The Section 11.2 Arbitration Agreement is valid and enforceable under the FAA.  The Court also finds Section 11.2 is enforceable by all parties under principles of equitable estoppel and requires arbitration on an individual basis.  The Court will now turn to the issue of arbitrability.

### C.    Gateway Issue Two: Arbitrability

The second gateway issue requires the Court to decide whether Section 11.2 encompasses Plaintiff's claims for unjust enrichment, breach of fiduciary duty, and aiding and abetting of breach of fiduciary duty.  *See Chiron Corp*, 2017 F.3d at 1130.  Defendants cite to *Kiskadee Communications (Bermuda), Ltd. v. Father* ("*Father*") for the proposition that claims involving the misrepresentation of performance obligations under a contract containing an arbitration agreement have a "significant relationship" to the contract and are thus subject to arbitration.  (Doc. 31 at 16 (citing 2011 WL 1044241 (N.D. Cal. March 22, 2011)).  Defendants argue Plaintiffs' unjust enrichment claims arise under the CC&Rs because they require interpretation of Defendants' performance obligations under the CC&Rs and thus are significantly related.  (Docs. 31 at 16–17; 32 at 10).  Defendants further contend Plaintiffs' claims regarding aiding and abetting thereto arise under the CC&Rs because the alleged fiduciary duties owed were created by the CC&Rs.  (Docs. 31 at 17; 31 at 10).  Plaintiffs argue Defendants' reliance on *Father* is misplaced because *Father* applied the legal standards for broad arbitration agreement while Section 11.2 is narrower.  (Doc. 37 at 28).  In Plaintiffs' view, their claims "do not turn on whether Defendants performed obligations under the 2013 CC&Rs or require interpretation of the

1    2013 CC&Rs and, instead, are based on independent wrongs." (*Id*.)

2    **1.    Legal Standard for Determining Arbitrability**

3    "The scope of an arbitration agreement is governed by federal substantive law."

4    *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994).

5    Whether a claim is arbitrable is determined according to the terms of the contract executed

6    by parties. *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1463 (9th

7    Cir. 1983). Broad arbitration agreements are those that reach disputes "arising out of or

8    relating to" the agreement, *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S.

9    395, 398 (1967), or "arising in connection with" the agreement, *see Simula, Inc. v. Autoliv,

10   Inc.*, 175 F.3d 716, 720 (9th Cir. 1999). Broad arbitration agreements encompass "every

11   dispute between the parties having a significant relationship to the contract and all disputes

12   having their origin or genesis in the contract." *Id*. By contrast, the phrase "arising under"

13   when used in isolation is "relatively narrow as arbitration clauses go." *Mediterranean,* 708

14   F.2d at 1464 (citing *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.

15   Supp. 359, 364 (S.D.N.Y. 1966)). In the case of narrow arbitration agreements, "arbitration

16   is restricted to 'disputes and controversies relating to the interpretation of the contract and

17   matters of performance.'" *Id*. In any event, "any doubts concerning the scope of arbitrable

18   issues should be resolved in favor of arbitration, whether the problem at hand is the

19   construction of the contract language itself or an allegation of waiver, delay, or a like

20   defense to arbitrability." *Chiron Corp.*, 207 F.3d at 1131 (quoting *Moses H. Cone Mem'l*

21   *Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

22   Here, the Section 11.2 Arbitration Agreement states that "any dispute *arising under*

23   th[ese CC&Rs] shall be governed by the provisions of this Section 11.2." (Doc. 31-2 at

24   41) (emphasis added). Section 11.2 does not include broad language such as "relating to"

25   or "in connection with." So, Section 11.2 is narrow in scope and applies only to disputes

26   relating to interpretation of or performance under the CC&Rs. *Mediterranean,* 708 F.2d

27   at 1464 (noting that an arbitration agreement that omits reference to disputes 'relating to'

28   the agreement is intended to cover a much narrower scope of disputes). The Court agrees

with Plaintiffs that Defendant's invocation of the "significant relationship" standard used in *Father* is not applicable here because *Father* dealt with an extremely broad arbitration agreement.  2011 WL 104424, at *2.  Even so, the Court finds Defendants' reasoning is sound under the standard for narrow arbitration agreements.

### 2.    Plaintiffs' Underlying Claims

Claims I and II allege the Developer Defendants were unjustly enriched when (a) they sold 40 acres of Great Park land without satisfying their obligations to Class Members concerning the Great Park, private parkland, private amenities (Doc. 1 at ¶¶ 85–90); and (b) they received CFD Funds provided by Class Members without constructing the promised private amenities for ECA members while for receipt of CFD Funds (*id.* at ¶¶ 91–97).  Because Plaintiffs' unjust enrichment claims are based on purported acts and omissions by Defendants relating to development plans, the Section 9.3 Modification of Community provision appears to cover such conduct.  (*See* Doc. 31-2 at 17) (permitting Defendant DMB Mesa "to construct improvements that are not contemplated by th[ese CC&Rs]" and stating that Defendant DMB Mesa "makes no representations or warranties as to the manner in which any other lands outside the property will be developed, and shall have no liability to any Owner of Occupant regarding the development of any other land in or around the property").  In light of Section 9.3, the Court agrees with Defendants that Plaintiffs' unjust enrichment claims relate to the interpretation of Defendants' performance obligations under the CC&Rs and so arise out of the CC&Rs.  (Docs. 31 at 16–17; 32 at 10); *Mediterranean,* 708 F.2d at 1464.  Plaintiffs will be compelled to arbitrate these claims under Section 11.2.

Claims III and IV allege the Board Defendants, with Developer Defendants' aid and abet, breached their fiduciary duties owed to Plaintiffs because they failed to act in good faith, failed to use ordinary care and prudence in managing the ECA land, and failed to act in the best interests of Class Members by allowing maldevelopment of the Eastmark Community.  (Doc. 1 at ¶¶ 98–108).  Article 2 of the CC&Rs outline the membership organization, voting structure, and administration of the ECA while Article 3 sets forth the

duties and powers of the ECA. (*See* Doc. 31-2 at 15–20). Specifically, Section 2.6 establishes the fiduciary relationship between the Board Defendants and the Plaintiffs as ECA members, stating that, "the [ECA] Board shall have authority to take all actions and perform all obligations *on behalf* of the [ECA.]" (Doc. 31-2 at 17) (emphasis added). These provisions demonstrate that Plaintiffs' breach of fiduciary duty claims relate to the interpretation of the Board Defendants' duties and obligations owed under the CC&Rs. Plaintiffs' aiding and abetting against the Developer Defendants require similar interpretation. Claims III and IV therefore arise out of the CC&Rs and are subject to Section 11.2 Arbitration Agreement. *See Mediterranean,* 708 F.2d at 1464. Plaintiffs must arbitrate these claims.

When resolving any doubts concerning the scope of arbitrable issues in favor of arbitration, as the Court must, the Court finds Section 11.2's narrow scope encompasses Plaintiffs' claims because all relate to the interpretation of and performance under the CC&Rs. *Chiron Corp.*, 207 F.3d at 1131; *Mediterranean,* 708 F.2d at 1464. Plaintiffs are compelled to arbitration.

**IV.    Conclusion**

In sum, the parties did not sufficiently delegate the issue of arbitrability to the arbitrator, which requires the Court to resolve the two gateway issues independently. *See Kaplan*, 514 U.S. at 943. The Court finds Section 11.2 is a valid and enforceable arbitration agreement and that all of Plaintiffs' claims "arise under" the CC&Rs and are subject to Section 11.2. Therefore, the Court must compel Plaintiffs to arbitrate their claims under Section 4 of the FAA. 9 U.S.C. § 4. And seeing that neither Defendants nor Plaintiffs have requested a stay of this matter pending the conclusion of arbitration under Section 3 of the FAA, the Court will dismiss this action without prejudice. *See* 9 U.S.C. § 3 ("[T]he court . . . shall *on application of one of the parties* stay the trial of the action until such arbitration has been had[.]") (emphasis added); *c.f. Smith v. Spizzirri*, 601 U.S. 472 (2024) (holding that that when ruling on a motion to compel arbitration where a party seeks to stay the case pending arbitration, the district court, upon finding the dispute is subject to

1    arbitration, is without discretion to dismiss without prejudice and must instead stay the

2    action).

3          Accordingly,

4          **IT IS ORDERED** that the Developer Defendants' "Motion to Dismiss Plaintiffs'

5    Claims Pursuant to Rule 12(b)(1), Fed. R. Civ. P. and Compel Arbitration pursuant to the

6    Federal Arbitration Act (9 U.S.C. § 1 *et seq.*)" (Doc. 31) and the Board Defendants'

7    "Motion to Dismiss Plaintiffs' Claims Pursuant to Rule 12(b)(1), Fed. R. Civ. P. and

8    Compel Arbitration pursuant to the Federal Arbitration Act (9 U.S.C. § 1 et seq.)"

9    (Doc. 32) are **GRANTED**.    Plaintiffs are compelled to arbitrate their claims on an

10   individual basis according to the Section 11.2 Arbitration Agreement.

11         **IT IS FINALLY ORDERED** that this matter is **DISMISSED** without prejudice.

12   Dated this 23rd day of July, 2024.

13

14

15   _____

16   Honorable Diane J. Humetewa
      United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28